United States Court of Appeals
Fifth Circuit

**F I L E D**

**July 29, 2005**

Charles R. Fulbruge III
Clerk

REVISED AUGUST 18, 2005

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 03-30752
_____

KAREN LECLERC; GUILLAUME JARRY;
BEATRICE BOULORD; MAUREEN D. AFFLECK,

Plaintiffs - Appellants - Cross Appellees,

versus

DANIEL E. WEBB, ET AL.,

Defendants,

DANIEL E. WEBB; HARRY J. PHILLIPS, In Their Respective
Official Capacities as Chairman and Vice-Chairman of the
Louisiana Committee on Bar Admissions;
JEFFERY P. VICTORY; JEANNETTE THERIOT KNOLL;
CHET D. TRAYLOR; CATHERINE D. KIMBALL, a/k/a Kitty Kimball;
JOHN L. WEIMER; BERNETTE JOSHUA JOHNSON, In Their
Official Capacities as Justices of the Louisiana
Supreme Court,
Defendants - Appellees - Cross Appellants.

**************************************************************

_____

No. 03-31009
_____

CAROLINE WALLACE; EMILY MAW,

Plaintiffs - Appellees,

versus

PASCAL F. CALOGERO JR., in his official capacity as
Chief Justice of the Louisiana Supreme Court;
JEFFREY P. VICTORY; JEANNETTE THERIOT KNOLL;

CHET D. TRAYLOR; CATHERINE D. KIMBALL; JOHN L. WEIMER;
BERNETTE J. JOHNSON, in their official capacities as
Justices of the Louisiana Supreme Court;
DANIEL E. WEBB; HARRY J. PHILLIPS, JR., in their
respective official capacities as Chairman and
Vice-Chairman of the Louisiana Committee on Bar Admissions,

Defendants - Appellants.

---

Appeal from the United States District Court
for the Eastern District of Louisiana,

---

Before JONES, SMITH, and STEWART, Circuit Judges.

EDITH H. JONES, Circuit Judge:

This appeal arises from two consolidated actions filed by nonimmigrant aliens whose status, according to Louisiana Supreme Court Rule XVII, § 3(B), renders them ineligible to sit for the Louisiana Bar.[1] The district courts disagreed whether the Louisiana rule impermissibly discriminates against the plaintiffs in violation of the Equal Protection Clause. Because the level of constitutional protection afforded nonimmigrant aliens is different from that possessed by permanent resident aliens, we hold that the Louisiana rule survives rational basis review.

**BACKGROUND**

**I. Louisiana Bar Rule**

Louisiana Supreme Court Rule XVII, § 3(B) ("Section

---

[1] LeClerc, et al. v. Webb, et al., 270 F. Supp. 2d 779 (E.D. La. 2003), and Wallace, et al. v. Calogero, et al., 286 F. Supp. 2d 748 (E.D. La. 2003). We consolidated these cases for purposes of this appeal.

2

3(B)") requires that "[e]very applicant for admission to the Bar of this state shall . . . [b]e a citizen of the United States or a resident alien thereof."  Prior to the adoption of Section 3(B), Louisiana precedent defined "resident alien" as a "foreign national[] lawfully within the United States."  In re Appert, 444 So. 2d 1208, 1208 (La. 1984).  In 2002, the Louisiana Supreme Court overturned Appert, and held that the term "resident alien . . . appl[ies] only to those aliens who have attained permanent resident status in the United States."  In re Bourke, 819 So. 2d 1020, 1022 (La. 2002).  As interpreted in Bourke, Section 3(B) effectively prohibits the instant plaintiffs — nonimmigrant aliens[2] who are "not entitled to live and work in the United States permanently" — from sitting for the Louisiana Bar.  Bourke, 819 So. 2d at 1022.

## II. The LeClerc Plaintiffs

The LeClerc plaintiffs, Karen LeClerc, Guillame Jarry, Beatrice Boulord, and Maureen Affleck, are nonimmigrant aliens who hold degrees from foreign law schools and seek leave to sit for the Louisiana Bar.  LeClerc and Jarry are French citizens admitted to the United States on J-1 student visas.[3]  Boulourd, also a French

---

[2]    The Immigration and Nationality Act distinguishes between immigrant and nonimmigrant aliens, negatively defining an immigrant alien as "every alien except an alien who is within one of the following classes of nonimmigrant aliens."  8 U.S.C. § 1101(a)(15) [IMMLS PSD INA § 101].  An alien falling into one of fifteen exclusionary categories is a nonimmigrant alien, a class generally delimited by a lack of intention to abandon his foreign country residence and entry into the United States for specific and temporary purposes.

[3]    Title 8 U.S.C. § 1101(a)(15)(J) [IMMLS PSD INA § 101], admits a nonimmigrant alien who:

3

citizen, was initially admitted to the United States on a J-1 student visa, but currently remains in the United States on an H-1B temporary worker visa.[4]  Affleck is a Canadian citizen initially admitted to the United States on an L-2 spousal visa,[5] but currently remains in the United States on an H-1B temporary worker visa.

As graduates of foreign law schools seeking permission to sit for the Louisiana Bar, each plaintiff was required to apply for an equivalency determination pursuant to Louisiana Supreme Court

---

having a residence in a foreign country which he has no intention of abandoning who is a bona fide student . . . is coming temporarily to the United States as a participant in a program . . . for the purpose of . . . studying . . . .

[4]      Title 8 U.S.C. § 1101(a)(15)(H)(i)(b) [IMMLS PSD INA § 101], admits a nonimmigrant alien who:

is coming temporarily to the United States to perform services . . . in a specialty occupation. . . . having residence in a foreign country which he has no intention of abandoning who is coming temporarily to the United States as a trainee . . . in a training program that is not designed primarily to provide productive employment . . . .

Pursuant to the 1990 Act, an H-1B visa holder is no longer required to maintain "a temporary residence abroad which he or she has no intention of abandoning." Steel on Immigration, §3:13, 3-35.  Nor is such a visa holder subject to the presumption of immigrant status.  8 U.S.C. § 1184(b).  However, the nature of an H-1B visa holder's status in the United States is still temporary, the visa holder is still subject to a six-year admission cap (three years admission plus three years extension) notwithstanding, inter alia, a change in status.  Steel, at 3:13, 3-73-74.

[5]      Title 8 U.S.C. § 1101(a)(15)(L) [IMMLS PSD INA § 101], derivatively admits a nonimmigrant "alien spouse and minor child[] of [an L-1] alien."

4

Rule XVII, § 6 ("Section 6").[6] Before the commencement of the LeClerc suit, Affleck applied for, and was denied an equivalency determination because her status did not comply with Section 3(B). The other plaintiffs filed for equivalency determinations after the suit commenced and were similarly refused. None of the plaintiffs appealed their equivalency denials as permitted by Louisiana Supreme Court Rule XVII, § 9 ("Section 9").[7]

On March 6, 2003, the plaintiffs filed suit, pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1367, against the Louisiana Supreme Court[8] and the Chairman[9] and Vice-Chairman[10] of the Louisiana Committee on Bar Admissions (collectively "defendants") in their official capacities. The plaintiffs challenged the enforcement of Section 3(B) and sought declaratory and injunctive relief and attorneys' fees. They requested expedited discovery related to the

---

[6]     LR XVII, § 6 provides that:

"An applicant who has graduated from a law school that is not located in the United States or its territories must submit an application for the Committee for an equivalency determination . . . ."

[7]     LR XVII, § 9 provides that:

Upon notice . . . that applicant has failed to fulfill one or more of the requirements of . . . Section 6, . . . , the applicant may appeal by petition directly to the Court.

[8]     Pascal F. Calogero, Jr., Jeffrey P. Victory, Jeanette T. Knoll, Chet D. Traylor, Catherine D. Kimball, John L. Weimer, and Bernette J. Johnson. The LeClerc plaintiffs did not name the Honorable Pascal F. Calogero, Jr., the lone dissenter in Bourke.

[9]     Daniel A. Webb.

[10]     Harry J. Phillips.

5

adoption of Section 3(B), including records of the Louisiana Supreme Court's official meetings, processes, and opinions. The defendants moved to quash the plaintiffs' discovery requests, asserting judicial and legislative immunity. Finding the defendants judicially immune, a magistrate judge granted the motion. On April 17, 2003, the plaintiffs moved for summary judgment, and the defendants countered with a motion to dismiss for lack of subject matter jurisdiction and failure to state a claim based, inter alia, on standing, ripeness, Eleventh Amendment, judicial and legislative immunity, and abstention grounds.

The district court partially granted the defendants' motion to dismiss, denied the plaintiffs' motion for summary judgment, and denied as moot the plaintiffs' appeal of the magistrate judge's discovery ruling.[11] While rejecting the defendants' jurisdictional arguments, the court held on the merits that: (1) Section 3(B) is not preempted by federal immigration or trade policy; (2) Affleck lacked standing to assert a claim under the NAFTA;[12] (3) the plaintiffs failed to state a claim for violation of either procedural or substantive Due Process; and

---

[11] The LeClerc plaintiffs appeal the discovery ruling, which this Court reviews for abuse of discretion. In re Grand Jury Proceedings, 115 F.3d 1240, 1243 (5th Cir. 1997). Because the plaintiffs' discovery requests border on the absurd, we find no such abuse.

[12] We affirm this ruling. As conceded in oral argument, Affleck, although a Canadian citizen, is not a beneficiary of NAFTA. Moreover, NAFTA limits enforcement to the Secretary of State and the United States Attorney General. Thus, even if a beneficiary of the treaty, Affleck has no private right of action thereunder.

(4) applying rational basis review, Section 3(B) is rationally related to legitimate state interests, and, thus, constitutional. The district court denied plaintiffs' motion to reconsider on July 30, 2003.[13]  Both parties timely noticed their appeals and cross-appeals.

## III. The <u>Wallace</u> Plaintiffs

The <u>Wallace</u> plaintiffs' suit landed before a different federal district judge in New Orleans.  Caroline Wallace and Emily Maw are nonimmigrant aliens who seek leave to sit for the Louisiana bar exam.  Both are citizens of the United Kingdom who were admitted to the United States on temporary visas.  Wallace holds an H-1B temporary worker visa and is licensed as an attorney in England and Wales.  Wallace is currently employed doing non-attorney legal work.  Maw was admitted to the United States pursuant to an F-1 student visa[14] and remains on an H-1B temporary

---

[13]     The plaintiffs appeal this ruling. We **AFFIRM**. We review a district court's denial of a motion for reconsideration for abuse of discretion. <u>Westbrook v. C.I.R.</u>, 68 F.3d 868, 879 (5th Cir. 1995). "Reconsideration of a judgment after its entry is an extraordinary remedy that should be used sparingly." <u>Templet v. HydroChem Inc.</u>, 367 F.3d 473, 479 (5th Cir. 2004).  A motion for reconsideration may not be used to rehash rejected arguments or introduce new arguments. <u>Westbrook</u>, 68 F.3d at 879.  In their motion, not only did the plaintiffs improperly re-argue the merits of their case, they also impermissibly asserted, for the first time, arguments under the General Agreement on Trade and Services ("GATS"), the Dormant Commerce Clause, and the right to travel.  As such, we find no abuse of discretion in the court's denial on the basis of these errors.  Moreover, having been improperly raised below, we will not consider on appeal the GATS, Dormant Commerce Clause, or right to travel arguments advanced by the plaintiffs.

[14]     Title 8 U.S.C. § 1101(a)(15)(F) [IMMLS PSD INA § 101], admits a nonimmigrant alien who:

ha[s] a residence in a foreign country which he has no intention of abandoning, is a bona fide student qualified to pursue a full course of study and [] seeks to enter the United States temporarily and

7

worker visa.[15] Maw holds a law degree from Tulane University Law School in New Orleans and is currently employed as a paralegal.

Before filing suit, Wallace applied for an equivalency determination, and avers that after she was initially granted permission to sit for the Bar, permission was revoked for her noncompliance with Section 3(B). Although the record is unclear, Maw either applied to sit for the Bar exam or moved for admission by reciprocity. Either way, the defendants denied her application for lack of Section 3(B) qualification.[16] Neither plaintiff appealed her denial to the Louisiana Supreme Court pursuant to Rule 9.

On May 2, 2003, the plaintiffs filed a suit against the defendants, which is parallel in all relevant respects to the LeClerc action. However, their motion to consolidate their action with the LeClerc suit was inexplicably denied. Cross-motions for judgment followed as in LeClerc, but with different results.

The Wallace district court denied the defendants' motion to dismiss and partially denied the plaintiffs' motion for summary judgment. Like the LeClerc court, the Wallace court rejected the defendants' jurisdictional arguments. The court dismissed the

---

solely for the purpose of pursuing such a course of study . . . .

[15] At oral argument, counsel represented that Maw is now an H-1B visa holder.

[16] Sometime after this suit commended, Maw took and passed the Louisiana Bar exam. Her admission to the Bar is stayed pending the outcome of this case.

8

plaintiffs' preemption claim, but denied their Due Process claim as moot. On the plaintiffs' Equal Protection claim, however, the court applied strict scrutiny review and held that because Section 3(B) is not the least restrictive means to achieve the state's asserted compelling interests, it is unconstitutional. Defendants timely noticed their appeal.

The two cases are consolidated on appeal in this court. Because the issues raised are nearly identical, any references to plaintiffs in the following discussion include, unless otherwise noted, the LeClerc and Wallace plaintiffs.

**STANDARD OF REVIEW**

We review de novo a district court's Rule 12(b)(1) (motion to dismiss for lack of subject matter jurisdiction), Rule 12(b)(6) (motion to dismiss for failure to state a claim upon which relief can be granted), and Rule 56 (motion for summary judgment) dispositions, applying the same standards as the district court. Bombardier Aerospace v. Ferrer, Poirot & Wansbrough, P.C., 354 F.3d 348, 352 (5th Cir. 2003).

**DISCUSSION**

**A. Federal Jurisdiction**

The defendants maintain that the plaintiffs lack standing and present unripe claims. They further assert judicial and legislative immunity from the LeClerc and Wallace suits pursuant to precedent and the Federal Courts Improvement Act of 1996 ("FCIA"),

9

42 U.S.C. § 1983.[17]

Standing and ripeness are two doctrines of justiciability that assure federal courts will only decide Article III cases or controversies. To achieve standing, a plaintiff must have suffered an injury in fact, see Elk Grove Unified Sch. Dist. v. Newdow, 124 S. Ct. 2301, 2308, 159 L.Ed.2d 98 (2004), and generally, "must submit to the challenged policy" before pursuing an action to dispute it. Ellison v. Connor, 153 F.3d 247, 254-55 (5th Cir. 1998). However, strict adherence to the standing doctrine may be excused when a policy's flat prohibition would render submission futile. Ellison, 153 F.3d at 255 (citing Moore v. United States Dept. of Agric., 993 F.2d 1222 (5th Cir. 1993)). The ripeness doctrine counsels against "premature" adjudication by distinguishing matters that are "hypothetical" or "speculative" from those that are poised for judicial review. United Trans. Union, 205 F.3d at 857. Even actions for declaratory relief, which by design permit pre-enforcement review, require the presence of an actual "case" or "controversy." Id. A pre-enforcement action "is generally ripe if any remaining questions are purely legal . . . [and] further factual development" is not required for effective judicial review. Id.

---

[17] Because federal jurisdiction cannot be waived or assumed, Rohm & Hass Texas, Inc. v. Ortiz Bros. Insulation, Inc., 32 F.3d 205, 207 (5th Cir. 1994), we address the defendants' jurisdictional arguments briefly even though they appeared to abandon these jurisdictional contentions at oral argument. See United Transp. Union v. Foster, 205 F.3d 851, 857 (5th Cir. 2000) (discussing the Court's obligation to independently examine its jurisdiction despite party concessions).

Both the futility exception to the standing doctrine and the pre-enforcement variance to the ripeness doctrine apply here. Strict compliance with the standing doctrine would have required each plaintiff (except Maw) to apply for an equivalency determination under Section 6 of the Louisiana Bar Rules before filing suit. Strict compliance with the ripeness doctrine would have required each plaintiff to file a Section 9 appeal of his or her equivalency denial or rejection prior to filing suit. All but two plaintiffs, Affleck and Wallace, failed to comply with Section 6, and none complied with Section 9.

Nevertheless, given Affleck's equivalency denial after her timely application, Wallace's equivalency revocation, and Section 3(B)'s prohibition against the admission of nonimmigrant aliens, as interpreted in Bourke, there is no reason to believe that the plaintiffs who failed to submit to Section 3(B) by filing timely Section 6 applications would have experienced different outcomes. The non-conforming plaintiffs' submission would have been a futility for standing purposes.[18] Likewise, the plaintiffs' failure to avail themselves of Section 9 is excused because the aforementioned facts undermine the utility of further factual development, leaving only pure legal questions for adjudication. The plaintiffs thus have standing and have asserted claims that are

---

[18] Although Maw's current status — having been permitted to take the Louisiana Bar — complicates this issue, the totality of the plaintiffs' experiences weigh in favor of a futility finding.

11

ripe for adjudication.

Next, rejecting the defendants' immunity defenses, we find that they are amenable to the instant suits. When acting in its enforcement capacity, the Louisiana Supreme Court, and its members, are not immune from suits for declaratory or injunctive relief. See Supreme Court of Virginia v. Consumers Union of the U.S., 446 U.S. 719, 100 S. Ct. 1967 (1980) (holding that the Virginia Supreme Court and its chief justice may be sued for acts committed in their enforcement capacities). Moreover, the FCIA of 1996 only precludes injunctive relief for suits against a judicial defendant acting in his "judicial capacity."[19] Thus, to the extent that the plaintiffs seek declaratory and injunctive relief against the enforcement of Section 3(B) only, the court and its individual members are subject to the instant suits.

## B. Merits

Plaintiffs contend that Section 3(B) violates their rights under the Equal Protection Clause of the Fourteenth Amendment, the Due Process Clause of the Fifth Amendment,[20] and the Supremacy Clause of Art. VI, cl. 2. Each contention will be

---

[19]     Title 42 U.S.C. § 1983 provides that:

[I]n any action brought against a judicial officer for an act or omission taken in such officer's **judicial capacity**, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

(emphasis added) (amended Oct. 19, 1996 by PUB. L. 104-317, TITLE III, § 309(c), 110 STAT. 3853).

[20]     Only the LeClerc plaintiffs assert a Due Process violation on appeal.

12

discussed in turn.

## 1. Equal Protection

The plaintiffs first advance arguments based on every conceivable level of Equal Protection analysis, contending that: (1) under In re Griffiths,[21] nonimmigrant aliens are a suspect class and state laws affecting them are subject to strict scrutiny; (2) in the alternative, nonimmigrant aliens are a quasi-suspect class and state laws affecting them are subject to intermediate scrutiny; and (3) in the alternative, if nonimmigrant aliens are not a suspect class at all, state laws affecting them are subject to rational basis review. Plaintiffs maintain that Section 3(B) fails under any of the three tests. Despite some ambiguity in Supreme Court precedent, we conclude that because Section 3(B) affects only nonimmigrant aliens, it is subject to rational basis review.

To begin, nonimmigrant aliens are not a suspect class under Griffiths. The plaintiff in Griffiths was a permanent resident alien, who, but for a Connecticut law that conditioned bar admission on United States citizenship, would have been eligible to sit for the Connecticut bar exam. 413 U.S. at 718, 93 S. Ct. at 2853. The instant plaintiffs, however, are nonimmigrant aliens.

_____

[21]    413 U.S. 717, 93 S. Ct. 2851 (1973).

13

The distinction, far from being a "constitutional irrelevancy,"[22] is paramount.[23]  Section 3(B) only affects nonimmigrant aliens who are "not entitled to live and work in the United States permanently."  Bourke, 819 So. 2d at 1022.  In contrast, the rule at issue in Griffiths effected a "total exclusion [of all] aliens from the practice of law" in Connecticut.  Griffiths, 413 U.S. at 719, 93 S. Ct. at 2853.  It was this "wholesale ban" of aliens from the Connecticut Bar that the Supreme Court found constitutionally infirm.  Id. at 725, 93 S. Ct. at 2856.  Moreover, as elaborated below, the Court took pains to categorize the ways in which resident aliens share essential benefits and burdens of citizenship, see id. at 722, 93 S. Ct. at 2855, in a way that aliens with lesser legal status do not.

Thus far, the Supreme Court has reviewed with strict scrutiny only state laws affecting permanent resident aliens.  As the highest level of Equal Protection analysis, strict scrutiny is employed when a governmental body creates a classification that

---

[22]  See City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 469, 105 S. Ct. 3249, 3269 (1985) (stating that "*Plyler*, for example, held that the status of being an undocumented alien is not a 'constitutional irrelevancy,' and therefore declined to review with strict scrutiny classifications affecting undocumented aliens").

[23]  See generally, David A. Martin, Graduated Application of Constitutional Protections for Aliens:  The Real Meaning of Zadvydas v. Davis, 2001 Supreme Court Review 47, esp. at 48, 86-87, 92-97, 107 (". . . I believe that the categorical approach still holds up and justifies a major distinction between LPRs [lawful permanent residents] and other aliens for constitutional purposes.").

14

burdens a fundamental right[24] or targets a suspect class. <u>Regents of University of California v. Bakke</u>, 438 U.S. 265, 357, 98 S. Ct. 2733, 2782 (1978). Although classifications based on alienage are inherently suspect and subject to close judicial scrutiny as a general matter, the Court's decisions have "never suggested that such legislation is inherently invalid, nor [has the Court] held that all limitations on aliens are suspect." <u>See</u> <u>Foley v. Connelie</u>, 435 U.S. 291, 294, 98 S. Ct. 1067, 1070 (1978) (internal citation omitted).

Beginning in 1971, the Court has applied some variation of strict scrutiny to invalidate state laws affecting "resident aliens" or "permanent resident aliens." <u>See</u> <u>Graham v. Richardson</u>, 403 U.S. 365, 371, 91 S. Ct. 1848, 1851 (1971) (applying "strict judicial scrutiny" and striking state laws that denied "resident aliens" disability benefits).[25] The Court has never applied strict scrutiny review to a state law affecting any other alienage classifications, <u>e.g.</u>, illegal aliens, the children of illegal

---

[24] The practice of law is not a fundamental right assertable by the plaintiffs, discussed infra.

[25] <u>See</u> <u>also</u> <u>Griffiths</u>, <u>supra</u> (applying "close judicial scrutiny"); <u>Exam. Bd. Eng'rs v. De Otero</u>, 426 U.S. 572, 602, 96 S. Ct. 2264, 2281 (applying "strict judicial scrutiny" and striking a law of Puerto Rico that prevented "resident aliens" from obtaining engineering licenses); <u>Nyquist v. Mauclet</u>, 432 U.S. 1, 7, 97 S. Ct. 2120, 2124 (1977) (applying "close judicial scrutiny" and striking a state law that prevented "permanent resident aliens" from receiving state financial assistance for higher education). These cases, especially <u>Graham</u>, follow from the Court's 1948 decision in <u>Takahashi v. Fish and Game Comm'n</u>, wherein the Court invalidated, on Supremacy Clause grounds, a California law that prevented resident aliens ineligible for citizenship from obtaining state fishing licences as inconsistent with Congressional determination to admit such aliens without burden or restriction. 334 U.S. 410, 419, 68 S. Ct. 1138, 1142 (1948).

aliens, or nonimmigrant aliens. In such cases, the Court has either foregone Equal Protection analysis, see Toll v. Moreno, 458 U.S. 1, 102 S. Ct. 2977 (1982) (nonimmigrant G-4 aliens); DeCanas v. Bica, 424 U.S. 351, 96 S. Ct. 933 (1976) (illegal aliens),[26] or has applied a modified rational basis review, see Plyler v. Doe, 457 U.S. 202, 102 S. Ct. 2382 (1982) (children of illegal aliens). In the latter case, Plyler, the Court employed a heightened level of rational basis review to invalidate a Texas law that denied primary public education to children of illegal aliens. See Plyler, 457 U.S. at 224, 102 S. Ct. at 2398 ("[the Texas law] can hardly be considered rational unless it furthers some substantial goal of the State.") (emphasis added).[27] Yet, while adopting a sui generis level of rational basis review, the Court acknowledged that the immigration status of the affected class of aliens precluded

---

[26]    Toll involved a University of Maryland policy that denied in-state tuition fees to domiciled G-4 nonimmigrant aliens and their dependents. The Court invalidated the policy on Supremacy Clause grounds, discussed infra, and expressly declined to reach the nonimmigrants' Due Process and Equal Protection claims. Toll, 458 U.S. at 9-10, 102 S. Ct. at 2982. In DeCanas, the Court reviewed a California law that prohibited the knowing employment of illegal aliens where such would adversely affect resident alien workers. The Court upheld the state law on Supremacy Clause grounds, discussed infra. DeCanas, 424 U.S. at 354-363, 96 S. Ct. at 936-940. In both Toll and DeCanas, the Court addressed state laws that not only affected but also drew distinctions among aliens in formulating state policies, yet in neither case did the Court employ Equal Protection analysis.

[27]    The compromised level of rational basis review is recognized in the concurring opinion of Justice Powell, id. at 238, 102 S.Ct at 2406 (approving the heightened rational basis analysis in the "unique circumstances" of this case), and the dissenting opinion of Justice Burger, id. at 244, 102 S. Ct. at 2409, (disagreeing that the unfortunate circumstance of illegal alien children entitles them to "special solicitude under the Equal Protection Clause").

use of either intermediate or strict scrutiny review.[28]

The development of this jurisprudence is consistent with the Court's fundamental rationale for applying strict scrutiny review exclusively to resident aliens: "[T]he state laws at issue in Graham, Nyquist, DeOtero, and Griffiths warranted close judicial scrutiny because they took position[s] seemingly inconsistent with the congressional determination to admit the alien to permanent residence." See Foley, 435 U.S. at 295, 98 S. Ct. at 1070 (emphasis added). The Court has uniformly focused on two conditions particular to resident alien status in justifying strict scrutiny review of state laws affecting resident aliens: (1) the inability of resident aliens to exert political power in their own interest given their status as virtual citizens; and (2) the similarity of resident aliens and citizens.

Given the extent to which resident aliens are legally entrenched in American society, their inability to participate in the political process qualifies them as "a prime example of a discrete and insular minority for whom [] heightened judicial solicitude is appropriate." See Griffiths, 413 U.S. at 721, 93

---

[28]    In determining that proper level of review to apply in that case, the Court stated:

> Undocumented aliens cannot be treated as a suspect class because their presence in this country in violation of federal law is not a "constitutional irrelevancy." Nor is education a fundamental right; a State need not justify by compelling necessity every variation in the manner in which education is provided to its population.

Plyler, 457 U.S. at 223, 102 S. Ct. at 2398. See id. at 218, n.16, 102 S. Ct. at 2395, n.16 (discussing but not applying intermediate scrutiny review).

17

S. Ct. at 2854-55 (citing United States v. Carolene Prods. Co., 304 U.S. 144, 152-53, n.4, 58 S. Ct. 778, 783-84, n.4 (1938)).[29] Characterizing resident aliens as a Carolene Products minority reconciles the breadth of rights and responsibilities they enjoy with their lack of political capacity.[30] Contrary to the plaintiffs' contention, nonimmigrant aliens — who ordinarily stipulate before entry to this country that they have no intention of abandoning their native citizenship, and who enter with no enforceable claim to establishing permanent residence or ties here — need not be accorded the extraordinary protection of strict scrutiny by virtue of their alien status alone.[31] Nonimmigrant aliens may, of course, qualify for anti-discrimination protection based upon race, sex, national origin and religious adherence, just

---

[29]     See also Graham, 403 U.S. at 373, 91 S. Ct. at 1852; Griffiths, 413 U.S. at 721, 93 S. Ct. at 2854-55; Nyquist, 432 U.S. at 17, 97 S. Ct. at 2129. See also Bakke, 438 U.S. at 290, 98 S. Ct. at 2748 (stating that Carolene Products insularity "may be relevant in deciding whether or not to add new types of classifications to the list of 'suspect' categories or whether a particular classification survives close examination").

[30]     In Foley, the Court stated that:

beginning with a case which involved the denial of welfare assistance essential to life itself, the Court has treated certain restrictions on aliens with 'heightened judicial solicitude,' Graham v. Richardson, 403 U.S. 365, 372, 91 S. Ct. 1848, 1852 (1971), a treatment deemed necessary since aliens – pending their eligibility for citizenship – have no direct voice in the political processes. See United States v. Carolene Prods. Co., 304 U.S. 144, 152-153, 58 S. Ct. 778, 783-784 (1938).

435 U.S. at 294, 98 S. Ct. at 1070 (citation marks edited).

[31]     Cf., Lea Brilmayer, Carolene, Conflicts, and the Fate of the "Insider-Outsider," 134 U. Pa. L. Rev. 1291 (1986).

18

as they may otherwise enjoy the benefits of American law.[32]  But their lack of legal capacity, unlike that of immigrant aliens, is tied to their temporary connection to this country.  Moreover, the numerous variations among nonimmigrant aliens' admission status make it inaccurate to describe them as a class that is "discrete" or "insular."[33]  Nonimmigrant aliens, in short, do not warrant Carolene Products status.

The Court's treatment of resident aliens also rests upon pragmatic recognition that resident aliens are similarly situated to citizens in their economic, social, and civic (as opposed to political)[34] conditions.  In Griffiths, the Court observed:

> Resident aliens, like citizens, pay taxes, support the economy, serve in the armed forces, and contribute in a myriad of other ways to our society.  It is appropriate that a State bear a heavy burden when it deprives them of

---

[32]     See e.g., 8 U.S.C. § 1324(b) (prohibiting "unfair immigration-related employment practices").

[33]     The Court makes this very point in Toll, stating that:

We noted that as to some categories of nonimmigrant aliens [B, F, and H visa holders], Congress had expressly conditioned admission ... on an intent not to abandon a foreign residence or, by implication, on an intent not to seek domicile in the United States . . . . With respect to G-4 nonimmigrant aliens, however, we concluded that Congress had deliberately declined to impose restrictions on intent, thereby permitting them to adopt the United States as their domicile.

458 U.S. at 7, n.8, 102 S. Ct. at 2980, n.8 (internal marks and citations omitted).

[34]     The Court has expressly declined to extend politically-oriented rights and opportunities to aliens.  See Foley, 435 U.S. 291, 98 S. Ct. 1067 (applying rational basis review and upholding a state law that conditioned employment as a state trooper on citizenship because the law implicated rights of governance); Cabell v. Cajvez-Salido, 454 U.S. 432, 444-47, 102 S. Ct. 735, 742-44 (1982) (applying "lower level scrutiny" and extending Foley to uphold a state law conditioning employment as a probation officer on citizenship).

19

employment opportunities.

Griffiths, 413 U.S. at 722, 93 S. Ct. at 2855.[35]  Like citizens, resident aliens may not be deported, are entitled to reside permanently in the United States,[36] may serve, voluntarily or by conscription, in the military,[37] are entitled to state aid benefits,[38] and pay taxes on the same bases as citizens.[39]

Nonimmigrant aliens' status is far more constricted than that of resident aliens.  Nonimmigrant aliens are admitted to the

---

[35]    See also Graham, 403 U.S. at 376, 91 S. Ct. at 1854 ("Aliens like citizens pay taxes and may be called into the armed forces.  Unlike the short-term residents in Shapiro, aliens may live within the United States for many years, work in the State and contribute to the economic growth of the State. There can be no 'special public interest' in tax revenues to which aliens have contributed on an equal basis with the residents of a state"); Matthews v. Diaz, 426 U.S. 67, 83, 96 S. Ct. 1883, 1893, 48 L.Ed.2d 478 (1976) ("citizens and those who are most like citizens qualify.  Those who are less like citizens do not."); Nyquist, 432 U.S. at 12, 97 S. Ct. at 2126-27 ("Resident aliens are obligated to pay their full share of the taxes that support the assistance programs.  There thus is no real unfairness in allowing resident aliens an equal right to participate in programs to which they contribute on an equal basis.").

[36]    Title 8 U.S.C. § 1101(a)(20) provides that:

The term "lawfully admitted for permanent residence" means the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, such status not having changed.

[37]    Title 10 U.S.C. § 3253 provides that:

In time of peace, no person may be accepted for original enlistment in the Army unless he is a citizen of the United States or has been lawfully admitted to the United States for permanent residence under the applicable provisions of the Immigration and Nationality Act (8 U.S.C. 1101 et seq.).

See also 10 U.S.C. § 8253 (same).

[38]    Graham, 403 U.S. at 371, 91 S. Ct. at 1851; Nyquist, 432 U.S. at 12, 97 S. Ct. at 2127.

[39]    Pursuant to the U.S. Tax Guide for Aliens "Resident aliens generally are taxed on their worldwide income, the same as U.S. citizens."  IRS Pub. 519, 2003 WL 23305933 (I.R.S.).

20

United States only for the duration of their status,[40] and on the express condition they have "no intention of abandoning" their countries of origin and do not intend to seek permanent residence in the United States.[41] They are admitted, remain, and must depart at the discretion of the Attorney General.[42] Plaintiffs acknowledge that nonimmigrant aliens may not serve in the U.S. military,[43] are subject to strict employment restrictions,[44] incur differential tax

----

[40]    8 C.F.R. § 214.2(f)(5)(I) provides that:

[d]uration of status is defined as the time during which an F-1 student is pursuing a full course of study at an educational institution . . . .

[41]    8 U.S.C. §§ 1101(a)(15(F), (H), (J); Steel, at §3:11, 3-35.

[42]    Title 8 U.S.C. § 1227(a)(1)(C) provides that:

Any alien  . . . in and admitted to the United States shall, upon the order of the Attorney General, be removed if . . . alien who was admitted as a nonimmigrant and who has failed to maintain the nonimmigrant status in which the alien was admitted or to which it was changed under section 1258 of this title, or to comply with the conditions of any such status, is deportable.

        Pursuant to 8 C.F.R. § 241.1(a)(3):

At the time of admission or extension of stay, every nonimmigrant alien must also agree to depart the United States at the expiration of his or her authorized period of admission or extension of stay, or upon abandonment of his or her authorised nonimmigrant status.

See also 8 U.S.C. § 1184 (explaining the manner in which the Attorney General's discretion pertains to various nonimmigrant alien categories).

[43]    10 U.S.C. § 3253.

[44]    See 8 C.F.R. § 214.1(e) (nonimmigrant aliens may not engage in productive employment without authorization); 8 C.F.R. § 214.2(f) (prohibiting F-1 visa holders from obtaining gainful employment, not including work-study and internship programs); 8 C.F.R. § 214.2(h) (permitting temporary employment of H-1B nonimmigrants); 8 C.F.R. § 214.2(l)(prohibiting L-2 spouses from obtaining employment without prior authorization). The penalty for unauthorized employment is a determination of "failure to maintain status." 8 C.F.R. § 214.1(e). The gainful employment ban may also be excepted in other cases of financial hardship. Steel, at 3-40-42.

treatment,[45] and may be denied federal welfare benefits.[46]  Finally, the Supreme Court has yet expressly to bestow equal protection status on nonimmigrant aliens.[47]

Based on the aggregate factual and legal distinctions between resident aliens and nonimmigrant aliens, we conclude that although aliens are a suspect class in general, they are not homogeneous and precedent does not support the proposition that nonimmigrant aliens are a suspect class entitled to have state legislative classifications concerning them subjected to strict scrutiny.  We decline to extend the Supreme Court's decisions concerning resident aliens to different alien categories when the Court itself has shied away from such expansion.  We thus turn to the plaintiffs' alternative Equal Protection arguments.

Contrary to the plaintiffs' contention, there is no precedential basis for the proposition that nonimmigrant aliens are a quasi-suspect class or that state laws affecting them are subject to intermediate scrutiny.  The decision in United States v.

---

[45]    Pursuant to the U.S. Tax Guide for Aliens, as compared to resident aliens and citizens, "Nonresident aliens are taxed only on their income from sources within the United States and on certain income connected with the conduct of a trade or business in the United States."  IRS Pub. 519, 2003 WL 23305933 (I.R.S.).

[46]    Matthews, 426 U.S. at 83, 96 S. Ct. at 1893.  See also 26 U.S.C. § 3306(c)(8) (amended by the American Jobs Creation Act of 2004, PL 108-357, October 22, 2004, 118 Stat 1418 and the Ronald W. Reagan National Defense Authorization Act For Fiscal Year 2005, PL 108-375, October 28, 2004, 118 Stat 1811).

[47]    Toll, 458 U.S. at 9-10, 102 S. Ct. at 2982 (refusing to reach equal protection argument).  Plyler is not to the contrary, as it involved the special class of alien children, who were not responsible for their immigration status, and the provision of education.

22

*Virginia*, 518 U.S. 515, 116 S. Ct. 2264 (1996), which reinforced caselaw that treats gender as a "quasi-suspect classification," furnishes no authority for the application of intermediate Equal Protection analysis to alienage classifications. *Virginia*, 518 U.S. at 532-33, 116 S. Ct. at 2275. Again, we decline to move where the Supreme Court has not gone.

By process of elimination, rational basis review must be the appropriate standard for evaluating state law classifications affecting nonimmigrant aliens. Here, caselaw has distinguished between traditional rational basis review and heightened rational basis review. But, the latter standard appears solely in *Plyler*, which, as noted, is a far different case from the case at bar. There, after declaring that undocumented aliens are not a suspect class[48] and that education is not a fundamental right, see id., 457 U.S. at 223, 102 S. Ct. at 2398, the Court found the children of illegal aliens, having no culpability for or control over their condition, are worthy of "special judicial solicitude" in the form of heightened rational basis review. Id. Thus, the Court elevated the rational basis test and inquired whether the Texas law "furthered some substantial goal of the state." Id. at 224, 102 S. Ct. at 2398 (emphasis added). Had the Court not modified

_____

[48]    Under the plaintiffs' rationale — that lack of political capacity alone should render an alien group worthy of heightened judicial solicitude and strict scrutiny review — undocumented aliens would be the most insular and deserving of Carolene Products minority status. Yet, the Court specifically denied them suspect status.

23

rational basis review in Plyler, the Texas law would have survived. As articulated by the Court, traditional rational basis analysis provides that:

> The initial discretion to determine what is "different" and what is "the same" resides in the legislatures of the States. A legislature must have substantial latitude to establish classifications that roughly approximate the nature of the problem perceived, that accommodate competing concerns both public and private, and that account for limitations on the practical ability of the State to remedy every ill. In applying the Equal Protection Clause to most forms of state action, we thus seek only the assurance that the classification at issue bears **some fair** relationship to a legitimate public purpose.

Id. 457 U.S. at 216, 102 S. Ct. at 2394 (emphasis added). Under the traditional test, Texas's legitimate interests — conservation of budget resources and deterrence of illegal immigration — probably would have been sufficient to justify the state's decision to deny state benefits to illegal entrants and their children. But in this unique instance, the Court was moved by the consequences and unfairness of enforcing such a regulation against children. Id. at 220, 102 S. Ct. at 2396.[49]

These plaintiffs who would be Louisiana lawyers find no support in Plyler. As nonimmigrant aliens, they entered this country voluntarily and with an understanding of their limited, temporary status. They face no hurdle as debilitating as denial of primary and secondary education. That, under Section 3(B), they

---

[49] The Court's invalidation of the Texas law further rested upon a determination that the state's action was not in accord with congressional policy. Id. at 224-25, 102 S. Ct. at 2399.

are denied the ability to engage in a specific type of legal work — that requiring a license — is simply not analogous to the plight of illegal alien children. Nothing in Plyler compels the determination that nonimmigrant alien law students and temporary workers are similarly situated to the children of illegal aliens, and, thus, entitled to similar heightened rational basis review.

Under traditional rational basis analysis, a state law classification that "neither burdens a fundamental right nor targets a suspect class" will be upheld "so long as it bears a rational relation to some legitimate end." Vacco v. Quill, 521 U.S. 793, 799, 117 S. Ct. 2293, 2297 (1997) (emphasis added). The key principle is the deference to legislative policy decisions embodied in courts' reluctance to judge the wisdom, fairness, logic or desirability of those choices. Viewed through this deferential lens, Section 3(B)'s classification bears a rational relationship to legitimate state interests — Louisiana's substantial interest in regulating the practice of those it admits to its bar. Section 3(B) aims to assure clients that attorneys licensed by the Louisiana Bar will provide continuity and accountability in legal representation. The Bar's ability to monitor, regulate, and, when necessary, discipline and sanction members of the Bar requires that it be able to locate lawyers under its jurisdiction. The State's determination that the easily terminable status of nonimmigrant aliens would impair these interests and their enforcement capacity is not irrational.

25

The plaintiffs argue that in focusing on the alleged transience of nonimmigrant aliens, Section 3(B) irrationally fails to deal with other causes of lawyer nonfeasance. While it is true that any attorney, regardless of citizenship status, could fall ill, become unavailable to clients, or leave the jurisdiction (and many actually do leave), such concerns are distinct from the special quandary arising from the federally prescribed transience of nonimmigrant aliens. The problem perceived by the defendants is that if a nonimmigrant practitioner leaves the country (voluntarily or by compulsion) to the detriment of Louisiana clients, such an attorney would be utterly beyond the reach of the Louisiana Bar. Contrary to the plaintiffs' contentions, the international transience of nonimmigrant alien practitioners is not analogous to that of a citizen or immigrant alien practitioner who leaves Louisiana. State reciprocity and interstate bar agreements would allow the Louisiana Bar to pursue an attorney who relocates domestically, but there is no doctrine of international reciprocity enabling the Louisiana Bar to reach a malfeasant or nonfeasant nonimmigrant attorney who has fled the United States. Even if the Bar tracked down such an attorney in a foreign country, because nonimmigrants (in contrast to citizens and immigrant aliens) may not establish domicile in the United States and will usually have limited assets here, Louisiana courts would have questionable ability to exercise jurisdiction over such a person. The state would be impotent to remedy unethical or incompetent conduct, and a Louisiana client's

ability to seek redress would be frustrated. Section 3(B) is underinclusive with respect to all possible foreseeable types of attorney abandonment, but it is not irrationally underinclusive with respect to this particularly troublesome situation.[50]

In these ways, Section 3(B), which limits Bar admission to persons able to live and work permanently in the United States, is rationally related to the state's interest in assuring continuity and accountability in legal representation. Section 3(B) does not make the mistake, remedied in Griffiths, of denigrating aliens in general. Instead, Section 3(B) recognizes that the inherent terms and conditions of nonimmigrant status all but assure a lack of continuity and impairment of the Bar's ability to carry out its regulatory and police functions. As such, Section 3(B) is a proper exercise of Louisiana's police powers in pursuit of these interests.

Plaintiffs also complain that Section 3(B) is irrationally overinclusive because it assumes that nonimmigrant alien practitioners will be transient, when in fact they are just as likely, having gone to the trouble to be admitted to the Louisiana Bar, to extend their stays in this country. The

---

[50] In concluding that the Bar Committee in Griffiths failed to establish the necessity of excluding "all aliens from the practice of law in order to vindicate its undoubted interest in high professional standards[,]" the Court noted that "once admitted to the bar, lawyers are subject to continuing scrutiny by the organized bar and the courts . . . . the range of postadmission sanctions extends from judgments for contempt to criminal prosecutions and disbarment." 413 U.S. at 727, 93 S. Ct. at 2857-58. The Louisiana Bar's concern that the temporary status of student and H-1B temporary worker visa holders might frustrate its ability to carry out these functions is legitimate.

27

plaintiffs' argument is plausible, but no more so than the state's contrary hypothesis. Moreover, unlike American citizens who seek admission to the bar in a state where they do not reside, the nature of nonimmigrant transience is substantially different — nonimmigrant aliens cannot unilaterally change their transient or noncitizen status.

The plaintiffs also generally criticize Section 3(B) as overbroad (e.g., because H-1B nonimmigrants must be sponsored by an employer, who in a case of malfeasance, may be ethically responsible for the attorney's misdeeds) and imprecise in achieving its desired ends. Even if it is flawed, the provision cannot be legitimately characterized as arbitrary or irrational. A court's inquiry is not for legislative precision, acuity, or acumen. See Romer v. Evans, 517 U.S. 620, 632, 116 S. Ct. 1620, 1627 (1996) (stating that "[i]n the ordinary case, a law will be sustained if it can be said to advance a legitimate government interest, even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous"). Section 3(B) may be undesirable in an increasingly globalized commercial climate, but our perception of the wisdom of the measure fails to render it constitutionally infirm under traditional rational basis review. Section 3(B) need only be rationally related to some legitimate end. Romer, 517 U.S. at 632, 116 S. Ct. at 1627. Section 3(B) is, at the least, "roughly approximate" to the concerns identified by Louisiana, given "limitations on the

28

practical ability of the state to remedy every ill." Plyler, 457 U.S. at 216, 102 S. Ct. at 2394.

Because Section 3(B) serves a legitimate end, and there is no basis for applying a heightened level of scrutiny, it survives rational basis review.

## 2. Due Process

The LeClerc plaintiffs assert procedural due process challenges to Section 3(B). As aliens, they are "'persons' guaranteed due process of law by the Fifth and Fourteenth Amendments." Plyler, 457 U.S. at 210, 102 S. Ct. at 2391 (citations omitted).[51] Procedural due process entitles a person to a hearing before being deprived of an interest protected by the Fourteenth Amendment. Bd. of Regents v. Roth, 408 U.S. 564, 570, 92 S. Ct. 2701, 2705 (1972). As relevant here, "the existence of . . . eligibility rules" gives a party seeking admission to practice his chosen profession "an interest and claim to practice . . . to which procedural due process requirements appl[y]." Roth, 408 U.S. at 577, n.15, 92 S. Ct. at 2709, n.15 (internal citation omitted). However, procedural due process rights do not vest in a party who has failed to seek a hearing before filing suit. Goldsmith v. United State Bd. of Tax Appeals, 270 U.S. 117, 123, 46 S. Ct. 215, 218 (1926); See also Myrick v. City of Dallas, 810 F.2d 1382, 1388 (5th Cir. 1987) (holding that a complainant

---

[51]    The Privileges and Immunities Clause protects only citizens. Compare Frazier v. Heebe, 482 U.S. 641, 107 S. Ct. 2607 (1987).

29

"cannot skip an available state remedy and then argue that the deprivation by the state was the inadequacy or lack of the skipped remedy"). Although Louisiana's Bar admission rules gave the plaintiffs an interest to which procedural due process rights attached, the plaintiffs cannot state a claim for a procedural due process violation because they opted not to appeal under Section 9.

### 3. Supremacy Clause and Preemption

The plaintiffs maintain that Section 3(B) is preempted by the comprehensive statutory scheme embodied in the Immigration and Nationality Act ("INA") and conflicts with some of its specific provisions.[52] Despite the federal government's primacy over the regulation of immigration, not "every state enactment which in any way deals with aliens is a regulation of immigration and thus per-se preempted . . . ." DeCanas, 424 U.S. at 355, 96 S. Ct. at 936. The Constitution, by committing regulation of immigration to the federal government, did not deprive the states of all power to legislate regarding aliens.[53] Id. Nevertheless, ostensibly harmonious state regulation may run afoul of the Supremacy Clause if it, in effect, interferes with the goals of federal policy. Id.

---

[52] The LeClerc plaintiffs further contend that NAFTA and GATS, which they argue are intended to liberalize United States licensing and certification requirements, evince congressional intent to preempt restrictive state licensing schemes. The LeClerc plaintiffs' arguments concerning NAFTA and GATS are, respectively, inapposite and unpreserved.

[53] See Plyler, 457 U.S. at 229, n.19, 102 S.Ct at 2396, n.19 ("If the Federal Government has by uniform rule prescribed what it believes to be appropriate standards for the treatment of an alien subclass, the States may, of course, follow the federal direction") (citing DeCanas, 424 U.S. 351, 96 S. Ct. 933).

Yet, even in this context, "[f]ederal regulation . . . should not be deemed preemptive in the absence of persuasive reasons — either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained." Id. at 356, 96 S. Ct. at 937 (internal citation omitted).

Section 3(B) is unquestionably a permissible exercise of Louisiana's broad police powers to regulate employment within its jurisdiction for the protection of its residents. See id. at 356, 96 S. Ct. at 937 (explaining that a state has "broad . . . police powers" to regulate employment within its borders). The Louisiana Supreme Court was rationally entitled to conclude that the temporary status of nonimmigrant aliens could impede the Bar's regulatory and disciplinary efforts.[54] Conditions that frustrate the administration of Louisiana's licensing scheme are "certainly within the mainstream of such police power regulation." Id. at 356-57, 96 S. Ct. at 937.

Further, as a state regulation dealing with the employment of nonimmigrant aliens, Section 3(B) is not facially preempted by the INA. The Supreme Court has acknowledged that "there is no indication that Congress intended to preclude state law in the area of [alien] employment regulation." Id. at 358, 362, 96 S. Ct. at 937-38, 940. Thus, the field of alien employment

---

[54]     Contrary to the plaintiffs' contentions, the status of bar admission rules in other states is neither controlling nor persuasive. A situation discerned as problematic by the state need not be viewed as pervasive or universal in order to justify the state's attempt to address it.

31

tolerates harmonious state regulation.

The fact that Section 3(B) denies Bar admission to some aliens and not to others conflicts neither with the INA nor with the Supreme Court's disposition in Toll.  In Toll, the Court invalidated a University of Maryland policy denying in-state tuition status to G-4 nonimmigrant aliens — who are permitted by congressional directive to establish domicile in the United States — as inconsistent with federal policy that prevented these student aliens from establishing state domicile.  Toll, 458 U.S. at 11, 102 S. Ct. at 2983.  Toll held that, "state regulation not congressionally sanctioned that discriminates against aliens lawfully admitted to the country is impermissible if it imposes additional burdens not contemplated by Congress."  However, the Court added a caveat:

> To be sure, when Congress has done nothing more than permit a class of aliens to enter the country temporarily, the proper application of the principle is likely to be a matter of some dispute.

Toll 458 U.S. at 12-13, 102 S. Ct. at 2983 (quoting, in part, DeCanas, 424 U.S. at 358, n.6, 96 S. Ct. at 938, n.6).  The substantive holding in Toll is distinguishable from the instant case for two reasons.  First, Section 3(B) raises the situation contemplated, but not addressed, in Toll — the validity of state laws affecting transient nonimmigrant aliens.  Second, there is no incongruity between what Congress permits of student and temporary worker nonimmigrants and what Section 3(B) prevents.

32

First, as with the alien class in general, the sub-class of nonimmigrant aliens is itself heterogenous, and the distinctions among them are relevant for preemption purposes. Toll specifically distinguished between G-4 nonimmigrant aliens — upon whom Congress expressly declined to impose domicile restrictions — and the F-1 student and H-1B temporary worker nonimmigrant aliens at issue in this case — upon whom Congress has clearly imposed domicile restrictions.[55]  Section 3(B) affects only the latter group.

Second, Section 3(B) does not succumb to the Toll infirmity of proscribing by state law what Congress expressly permits by federal statute.  Section 3(B) does not prevent the legal matriculation of nonimmigrant alien students admitted to the United States on F-1 or J-1 visas.  Section 3(B) is, in fact, consistent with provisions that prohibit student visa holders from obtaining gainful employment, require them to obtain specific authorization

---

[55]    As the Court stated in Toll:

[T]he nonimmigrant classification is by no means homogeneous . . . . For example, Congress expressly conditioned admission for some purposes on an intent notto abandon a foreign residence or, by implication, on an intent not to seek domicile in the United States . . . .  [A] nonimmigrant student is defined as "an alien having a residence in a foreign country which he has no intention of abandoning . . . and who seeks to enter the United States temporarily and solely for . . . study . . . ."  § 101(a)(15)(F). See also . . . § 101(a)(15)(H) (temporary worker having residence in foreign country "which he has no intention of abandoning"). . . .  But Congress did not restrict every nonimmigrant class.  In particular, no restrictions on a nonimmigrant's intent were placed on [G-4] aliens . . . [T]his was deliberate . . . confirmed by the regulations . . . which provide that G-4 aliens are admitted for an indefinite period . . . .

Toll, 435 U.S. 647, 665, 98 S. Ct. 1338, 1349 (emphasis added).  See also Toll II, 458 U.S. at 7, n.8, 102 S. Ct. at 2980, n.8 (citing Toll, 435 at 665, 98 S. Ct. at 1349 and 8 U.S.C. §§ 1101(a)(15)(B), (F), (H)).

for certain types of matriculation-related employment, e.g., internships and work-study programs, requires their departure at the expiration of their status, and prohibits them from establishing domicile in the United States.

Nor does Section 3(B), contrary to plaintiffs' contentions, prevent them from complying with H-1B nonimmigrant visa requirements.  H-1B status requires the nonimmigrant applicant to qualify for a temporary worker visa by presenting documentation of:  a state professional license; a bachelor's, or higher, degree in the profession; an equivalent foreign degree; or equivalent foreign experience.  8 C.F.R. § 214.2(h).  H-1B's four compliance measures are disjunctive; its professional licensing option is permissive, not mandatory.  While Section 3(B) permits one of these alternatives, it does not prevent an H-1B visa holder who satisfies at least one of the other compliance methods from obtaining employment within the broad field encompassed by the practice of law.  Moreover, Section 3(B) is consistent with an H-1B visa provision that contemplates non-licensed employment.[56]  As demonstrated, Section 3(B) is in accord, rather than conflict, with

---

[56]     8 C.F.R. § 214.2(h) provides that:

Duties without licensure. In certain occupations which generally require licensure, a state may allow an individual to fully practice the occupation under the supervision of licensed senior or supervisory personnel in that occupation. In such cases, the director shall examine the nature of the duties and the level at which they are performed. If the facts demonstrate that the alien under supervision could fully perform the duties of the occupation, H classification may be granted.

34

federal regulation of alien employment.

The plaintiffs finally argue that the INA impliedly preempts Section 3(B) because it "stands as an obstacle to the accomplishment and execution of the full purpose and objectives of Congress." DeCanas, 424 U.S. at 363, 96 S. Ct. at 940. We disagree. As the Court made clear in DeCanas, the intersection of state and federal law does not necessarily require or effect preemption. Upholding a California law criminalizing the employment of illegal aliens, DeCanas held that the overlap of state and federal law did not equate to "withdrawal from the States of power to regulate where the activity regulated was a mere peripheral concern" to the federal law. Id. at 361, 96 S. Ct. at 939. Similarly, while Section 3(B) prohibits Bar admission of nonimmigrant aliens even though the INA permits H-1B visa holders to seek professional licensing, the provision is "peripheral" to intersecting federal law which does not itself mandate domestic professional licensing.

Section 3(B) is a state Bar rule designed to address local problems arising from the transitory status of nonimmigrant aliens who, by the terms and conditions of their federal status, possess fewer ties to the United States than any other group (besides illegal aliens). Section 3(B) attempts to protect Louisiana residents seeking legal representation and affects a class of persons whom Congress has expressly prohibited from living or working permanently in the United States. See id. at 363, 96

35

S. Ct. at 940 (explaining that although federal law predominates in the field of immigration, there is minimal federal interest in state laws crafted to address local problems and affecting local entities in a manner consistent with federal declarations). Rather than standing as an obstacle to federal law, Section 3(B) is consistent with the federal policy embodied in the INA.

**CONCLUSION**

For the reasons stated herein, the judgment in <u>LeClerc, et al. v. Webb, et al.</u>, 270 F. Supp. 2d 779 (E.D. La. 2003) is **AFFIRMED**. The judgment in <u>Wallace, et. al. v. Calogero, et al.</u>, 286 F. Supp. 2d 748 (E.D. La. 2003) is **REVERSED**.

CARL E. STEWART, Circuit Judge, concurring in part and dissenting in part:

I concur in the panel's majority decision affirming the district courts' rulings that: (1) Section 3(B) is not preempted by federal immigration or trade policy; (2) the defendants' jurisdiction arguments should be denied; (3) the plaintiffs' due process arguments should be dismissed, (4) plaintiff Affleck lacked standing to assert a claim under the NAFTA, and (5) the Leclerc plaintiffs' motion to reconsider should be denied. For the following reasons, I respectfully dissent from the majority's conclusion that the plaintiffs' Equal Protection claim should be dismissed.

First, I disagree with the majority's conclusion that strict scrutiny review should not apply to the issue before us. The Supreme Court in Graham v. Richardson held that "classifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny. Aliens as a class are a prime example of a 'discrete and insular' minority for whom such heightened judicial solicitude is appropriate." 403 U.S. 365, 372 (1971)(internal citation omitted); see also Applications of Griffiths, 413 U.S. 717, 721 (1973). It should be noted that not all limitations on aliens are suspect. See Foley v. Connelie, 435 U.S. 291, 294 (1978). Although the general rule is that classifications of aliens are suspect and strict scrutiny should apply, the Court has also held that less than strict

scrutiny is warranted where a state law discriminates based on alienage classification regarding matters related to the democratic process.  Id. ("a democratic society can be ruled by its own people").  Also, because Congress has plenary power to regulate immigration, federal statutes and presidential orders that discriminate against aliens are also reviewed with something less than strict scrutiny.  Mathews v. Diaz, 426 U.S. 67, 81 (1976) ("the relationship between the U.S. and our alien visitors has been committed to the political branches of the federal government.  Since decisions in these matters may implicate our relations with foreign powers . . . such decisions are frequently of a character more appropriate to either the Legislature or the Executive branches than to the Judiciary.").  In all other circumstances, the Supreme Court has applied strict scrutiny to classifications based on alienage.  Alienage is defined as the state or condition of being an alien.  BLACK'S LAW DICTIONARY 79 (8th ed. 1999).  An alien is "any person not a citizen or national of the United States."  8 U.S.C. § 1101(a)(3).  The majority is wary about "expanding" strict scrutiny review to nonimmigrant aliens as a distinctive suspect class in the absence of a black letter holding by the U.S. Supreme Court to that effect.  I disagree with the majority's reservations because the Supreme Court's statement that "alienage is a suspect class" by definition includes nonimmigrant aliens as part of that class.

The majority emphasizes that, as opposed to the Rule at issue here, "the rule at issue in <u>Griffiths</u> effected a 'total exclusion [of all] aliens from the practice of law' in Connecticut." Proposed Op. at 15. However, the Supreme Court has stated that "[t]he fact that the [challenged] statute is not an absolute bar [against all aliens] does not mean that it does not discriminate against the class." <u>Nyquist v. Mauclet</u>, 432 U.S. 1, 9 (1977). It is only important that the Rule is directed at aliens and only aliens are harmed by it. <u>Id.</u> Section 3(b) only allows citizens and resident aliens to apply for admission to the Louisiana state bar. <u>In re Bourke</u>, 819 So.2d 1020, 1021 (La. 2002). Because the Louisiana Supreme Court has defined resident aliens as "aliens who have been granted permanent resident status in the United States," <u>id.</u>, the Rule discriminates against all nonimmigrant aliens. The Rule does discriminate against the class because it is directed at aliens and only aliens are harmed by it.

In discussing the alien suspect class, the Supreme Court has referred to resident aliens, aliens and non-citizens interchangably. The majority uses the term resident aliens in referring to the suspect class first created in <u>Graham v. Richardson</u>. In order to properly understand the semantics in this case, it is necessary to explore the definitions used in the Immigration and Nationality Act (INA), 8 U.S.C. § 1101, *et seq*. All aliens legally admitted in the U.S. fall into one of two

39

categories: immigrant (persons who want to become permanent residents) and non-immigrant (persons granted stay for a limited period of time).  DAVID WEISSBRODT, IMMIGRATION LAW AND PROCEDURE § 5-1 – 6-1(4th ed. 1998).  These two broad categories are each further divided into specific types of visas.   Id.  In the INA, there is no definition of resident alien, only a definition of residence as referring "only to the place of general abode without regard to intention."[57]  See 8 U.S.C. § 1101(a)(33).  Thus, residence and immigration status should be understood as two separate distinctions; one does not necessarily have to do with the other.  As the district court noted in Wallace v. Calogero, "the term 'resident alien' is broader than the Act's immigration categories and includes both immigrant and nonimmigrant aliens lawfully residing in the United States."  286 F. Supp. 2d 748, 762 (E.D. La. 2003).  In other words, a nonimmigrant alien who lives in the United States is but one class of resident alien.  I read the term "resident alien," as it is used in the Supreme Court's jurisprudence, as simply indicating that the alien resides in the

---

[57]     Resident alien is essentially a tax distinction.  See 26 U.S.C. § 7701(b). There are primarily two ways to determine whether one is a resident alien for tax purposes.  The first is the green card test, if you have a green card, and therefore are a permanent resident, you are a resident under tax law. Id. at § 7701(b)(1)(A)(i).  The other is the substantial presence test.  Under the substantial presence test you will be considered a U.S. resident if you were physically present in the U.S. for at least 31 calendar days during the course of the year and 183 days during the 3 year period that includes the current year and two previous years immediately before it. Id. at § 7701(b)(3). Considering H-1B visa holders, for example, can stay in the country for up to 6 years, it is possible for an alien to be both a non-immigrant and pay taxes as a resident alien.

United States.  This point is further made clear by Justice Blackmun's majority opinion in <u>Kleindienst v. Mandel</u>, 408 U.S. 753 (1972).  Justice Blackmun, the author of the majority opinion in <u>Graham</u>, used the term "nonresident alien" to refer to plaintiff Ernest Mandel, a Belgian citizen who resided in Brussels.  408 U.S. at 762.

The Court has not distinguished between immigrant aliens or nonimmigrants aliens when discussing the alienage suspect class even though the Court has had before it cases which involved extensive review of the Immigration and Naturalization Act and its various classifications for admitted aliens; the Court was not ignorant of the terminology associated with the INA's alien classifications nor presumably of the distinctions between these classifications.  <u>See e.g.</u>, <u>Kleindienst</u>, 408 U.S. at 753, 757 n.4 (holding that a Belgian citizen living in Brussels, "as an unadmitted and nonresident alien, had no constitutional right of entry to this country as a nonimmigrant or otherwise"); <u>see also</u> <u>Saxbe v. Bustos</u>, 419 U.S. 65 (1974) (holding that daily and seasonal alien commuters qualify as immigrant aliens rather than as nonimmigrant aliens).  Despite the Court's familiarity with the distinction between immigrant and nonimmigrant aliens, the Court has still spoken of a general "alien" suspect class.

The defendants and the majority rely heavily on the fact that the Court's cases that employ strict scrutiny analysis all involved

plaintiffs who were permanent resident aliens.[58]  However, I am not persuaded that based on this fact alone, the Court's strict scrutiny analysis should be restricted to laws that discriminate against permanent resident aliens.  Again, the Supreme Court has not explicitly emphasized the alien plaintiffs' permanent resident status in discussing the alien suspect class.  As the majority opinion observes, nonimmigrant aliens have come before the Court asserting Equal Protection claims.  Twice the Court found it unnecessary to reach the Equal Protection issue, see Toll v. Moreno, 458 U.S. 1 (1982) and Decanas v.  Bica, 424 U.S. 351 (1976), and once the Court applied rational basis review, see Plyler v.  Doe, 457 U.S. 202 (1982).  Although the Court applied rational basis review to the aliens in Plyler, as the majority notes, Plyler "is a far different case from the case at bar." Proposed Op.  at 24.  Plyler involved illegal aliens.  In refusing to grant suspect classification to illegal aliens, the Court focused on their undocumented and unlawfully status.  Plyer, 457 U.S. at 219 n.19.  The nonimmigrant aliens here, by contrast, are lawfully admitted aliens.  The Court's opinions have applied strict scrutiny review when the plaintiffs at issue are lawfully admitted aliens who reside in the United States, like the plaintiffs here. See e.g., Takahashi v. Fish & Game Comm'n, 334 U.S. 410, 420

---

58    It should be noted that in some of the Supreme Court's opinions, the exact nature of the plaintiff's immigration status is unclear or not discussed. See e.g., Takahashi v. Fish & Game Comm'n, 334 U.S. 410 (1948).

(1948); Graham, 403 U.S. at 371.

The majority also relies heavily on the Supreme Court's statement in Griffiths that "[r]esident aliens, like citizens, pay taxes, support the economy, serve in the Armed Forces, and contribute in myriad other ways to our society. It is appropriate that a State bear a heavy burden when it deprives them of employment opportunities." 413 U.S. at 722. Nonimmigrant aliens do pay taxes, support the economy and contribute in other ways to our society. See n.1, *supra*. Nonetheless, I am not persuaded that an aliens' ability to serve in the Armed Forces or pay taxes is the primary rationale for affording suspect class designation to aliens; after all aliens were afforded suspect class designation before Griffiths. See Graham, 403 U.S. 365. Instead, the basis for aliens' class designation seems to be premised on aliens' inability to vote, and thus their impotence in the political process, and the long history of invidious discrimination against them. See Plyer, 457 U.S. at 218 n.14 (citing Graham, 403 U.S. at 372); see also ERWIN CHEMERINSKY, CONSTITUTIONAL LAW 618-19 (1997). See generally Takahashi, 334 U.S. 410.

In order to distance nonimmigrant aliens from the class of "aliens" that the Supreme Court has recognized as inherently suspect, the majority emphasizes the temporary and "transient" status of nonimmigrant aliens. However, the majority is unable to avoid the Supreme Court's ruling in Toll v. Moreno, which

43

recognized that nonimmigrant aliens who hold a G-4 visa are aliens with permanent status similar to citizens and immigrant aliens. 458 U.S. 1 (1983); see also Elkins v. Moreno, 435 U.S. 647, 663-64 (1978). The majority vigorously asserts that G-4 nonimmigrant aliens are distinct from the nonimmigrant aliens here because the aliens here are "transient nonimmigrant aliens," a new alienage classification crafted by the majority's opinion only. However, the constitutional challenge here is not an as applied challenge to Section 3(b). The plaintiffs assert that the rule discriminates against all nonimmigrant aliens. Therefore, if one nonimmigrant alien group does not fit within the opinion's analysis- that nonimmigrant aliens are not a suspect class because they are not "permanent" residents- then the majority's argument as a whole must fail.

The majority states that "nonimmigrant aliens–who ordinarily stipulate before entry to this country that they have no intention of abandoning their native citizenship, and who enter with no enforceable claim to establishing permanent residence or ties here–need not be accorded the extraordinary protection of strict scrutiny by virtue of their alien status alone." Proposed Op. at 19. But, not all nonimmigrant aliens are required to keep a permanent residence abroad and are not allowed to intend to stay in the United States. Besides, G-4 nonimmigrant aliens, the Immigration Act of 1990 states that H-1 and L category visa holders

44

(as some of the plaintiffs are here) do not have to pledge an intention to only stay in the United States temporarily, and can seek permanent residence in the United States. 22 C.F.R. § 41.11; 8 C.F.R. §§ 214.2 (h)(16), (1)(16); 68 No. 21 Interpreter Releases 681-84 (June 3, 1991). The BIA and the State Department also recognize the doctrine of dual intent, which allows nonimmigrant aliens who are required to keep a permanent residence in their foreign country to both express a short term intent to remain in the United States temporarily (so as to not contravene the requirements of the visa under which they entered) and a long term intent to remain in the United States permanently (so that they may apply for adjustment of status). Matter of Hosseinpour, 15 I&N Dec. 191, 192 (BIA 1975); 70 No. 42 Interpreter Releases 1444, 1456-58 (No. 1, 1993).

I read the Supreme Court's jurisprudence to provide that nonimmigrant aliens, as persons who are not citizens nor nationals of this country, are part of the alien suspect class and therefore, laws that discriminate against them are inherently suspect and should be subjected to strict scrutiny review. Because of the Court's opinions, the presumption should be that nonimmigrant aliens are part of the alien suspect class and the defendants should have the burden of proving the opposite. I am not persuaded by the arguments put forth by the defendants that the Supreme Court did not intend to include nonimmigrant aliens as part of the

45

alienage suspect classification.

Nevertheless, even assuming *arguendo* that rational basis is the appropriate analysis to be used in this case, I disagree with the majority's holding that the Louisiana rule survives rational basis review. To pass rational basis review, the defendants must show that nonimmigrant aliens pose some special threat to the State's legitimate interests, in a way that other permitted bar applicants, citizens or immigrant aliens, do not. <u>See</u> <u>City of Cleburne, Tex. v. Cleburne Living Ctr.</u>, 473 U.S. 432, 447-50 (1985) ("it is true that the mentally retarded as a group are indeed different . . . [b]ut this difference is largely irrelevant unless the [group home] and those who would occupy it would threaten legitimate interests of the city in a way that other permitted uses such as boarding houses and hospitals would not. Because in our view the record does not reveal any rational basis for believing that the Featherston home would pose any special threat to the city's legitimate interests, we affirm the judgment below ").

The majority opinion's discussion of the equal protection claim is most problematic at this point because it is in essence trying to "push a square peg into a round hole." The defendants assert that nonimmigrant aliens pose a special threat to the integrity of the Louisiana bar because they could be unexpectedly deported or they could leave and go back to their home country, leaving litigants in the lurch. The defendants assert that unlike

46

citizens and immigrant aliens, nonimmigrant aliens are more susceptible to being "international transients." The Louisiana Supreme Court would be unable to reach malfeasant attorneys because the Louisiana bar does not have reciprocity with other nations and because nonimmigrant aliens are not able to establish domicile and, therefore, the state courts could not assert jurisdiction.

However true that may be, these concerns apply equally to both citizens and immigrant aliens. Citizens have a constitutional right to travel. <u>Califano v. Gautier Torres</u>, 435 U.S. 1 (1978). Although the Louisiana state bar may have reciprocity with other states, citizens could leave the country and establish residency abroad, and as the majority states, Louisiana does not have reciprocity with other nations. Likewise, immigrant aliens may travel abroad and not return, leaving clients behind. Moreover, both nonimmigrant aliens and immigrant aliens are subject to deportation; only citizens may not be deported. The majority asserts that nonimmigrant aliens pose a special threat to Louisiana clients because nonimmigrant aliens may not establish domicile or have assets in Louisiana and, therefore, the courts may be precluded from asserting jurisdiction over nonimmigrant attorneys should the need to reach them arise. But the Louisiana bar has no requirement that bar applicants, or bar members, be Louisiana residents or spend any time in Louisiana or in any way have a connection with the state. Therefore, Louisiana courts may also be

47

unable to assert jurisdiction over members of the Louisiana bar who are citizens or immigrant aliens. Moreover, it may be possible for nonimmigrant aliens to be domiciled in Louisiana-as the Supreme Court found that the nonimmigrant alien plaintiffs were in Toll. See 458 U.S. at 17. As the district court in Wallace averred:

> The Rule does not restrict membership to the bar to citizens and immigrant aliens who plan to reside permanently in Louisiana. Nonimmigrant aliens as a class are not necessarily more transient than other groups. Citizens and immigrant aliens may be admitted to the bar even if they have no intention of residing in Louisiana. Louisiana attorneys relocate to other states and maintain bar membership in states where they do not reside. Due to advances in technology, attorneys can provide services and representation to clients from virtually anywhere. Louisiana attorneys retire, die, and leave the practice for a myriad of reasons. If the Louisiana Supreme Court were concerned with transience, the Rule would be calculated to address that problem directly. However, the Rule only excludes a fraction of persons who may have temporary residence in the state. The fact that the Plaintiffs must leave on a date certain does not change the analysis. On the contrary, it might be an advantage. Plaintiffs will be able to plan in advance for their

48

> departure and make the necessary arrangements to protect the interests of their clients.

Wallace, 286 F. Supp.2d at 763.

In my view, the Louisiana rule does not pass constitutional muster under even the exceedingly permissive rational basis standard of review. The Rule at issue is purported to be a prophylactic remedy to insulate potential clients from lawyers who are forced to leave the country unexpectedly, or who leave the country voluntarily, without an available means for the state courts to assert jurisdiction to reach the malfeasant attorneys. However, if the purpose of the Rule is to protect court dockets from disruption and protect the state's citizens from lawyers who may leave suddenly, the Rule is not the least restrictive way to do it nor, as the district court in Wallace noted, is the Rule in fact calculated to achieve this purpose.

For the foregoing reasons, I respectfully dissent from the majority's dismissal of the plaintiffs' Equal Protection claim and the reversal of the district court's judgment in Wallace v. Calogero.