# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

December 1, 2011

Lyle W. Cayce
Clerk

No. 10-30882

_____

ESTHEE VAN STADEN,

Plaintiff-Appellant,

versus

EUGENE ST. MARTIN, Medical Doctor in His Official Capacity as
Chairman of the Louisiana State Board of Practical Nurse Examiners,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Eastern District of Louisiana

_____

Before SMITH, BARKSDALE, and BENAVIDES, Circuit Judges.
JERRY E. SMITH, Circuit Judge:

The Louisiana State Board of Practical Nurse Examiners (the "Board") denied a license to Esthee Van Staden solely on account of her immigration status; she is an alien who has applied for permanent residence. She sued the Board, claiming its status requirement violates the Constitution. The district court granted the Board summary judgment on all grounds. Because applicants

No. 10-30882

for permanent resident status do not constitute a suspect class under the Equal Protection Clause, and a rational basis supports the immigration-status requirement, we affirm.

I.

Van Staden, a citizen of the Republic of South Africa, has lived in the United States since 2001. She is a licensed practical nurse ("LPN") in Texas but moved to Louisiana in February 2007. She applied to the Board for a license but was allegedly rejected solely for immigration status; as currently written,[1] LA. REV. STAT. § 37:970(2) requires that LPN applicants "[b]e a permanent resident or citizen of the United States." In July 2007, Van Staden applied to United States Citizenship and Immigration Services ("USCIS") to become a permanent resident alien. She has not yet received that status, though she is authorized to work in the United States.[2]

Van Staden sued the Board, alleging section 37:970(2) to be unconstitutional. Her complaint averred that the law improperly discriminates against aliens in violation of the Constitution's equal protection, due process, and right to travel guarantees and Supremacy and Dormant Commerce Clauses. She then moved for summary judgment. Claiming that *LeClerc v. Webb*, 419 F.3d 405 (5th Cir. 2005), controls, the Board also moved for summary judgment. The district court granted the Board's motion on the basis of *LeClerc*. On appeal, Van Staden maintains only her equal-protection argument.

---

[1] The law was amended after the district court's ruling, liberalizing the immigration requirement somewhat, but not enough to moot Van Staden's claim. *See* LA. REV. STAT. § 37:970(2) (1968) (amended June 25, 2010) (requiring that an LPN applicant "[b]e a citizen of the United States or have taken out his first citizenship papers").

[2] Van Staden's counsel represented at oral argument that USCIS has approved her application, but Van Staden must still wait until a visa number becomes available to receive permanent resident alien status.

No. 10-30882

## II.

## A.

This case is controlled by *LeClerc*, in which the majority interpreted the Supreme Court's alienage jurisprudence to indicate that nonimmigrant aliens are not "a suspect class entitled to have state legislative classifications concerning them subjected to strict scrutiny." *LeClerc*, 419 F.3d at 419. *LeClerc* need not be extended to cover the facts of this case; it need only be restated.[3]

In *LeClerc*, this court heard two consolidated appeals involving nonimmigrant aliens[4] challenging a Louisiana Supreme Court rule that allowed only citizens and permanent resident aliens to apply for admission to that state's bar. Resolving "some ambiguity in [United States] Supreme Court precedent," *id.* at 415, this court combed through the Court's alienage jurisprudence to conclude

---

[3] Insofar as Van Staden asks this panel to overturn *LeClerc*, her argument fails. Our rule of orderliness prevents one panel from overruling the decision of a prior panel. *Teague v. City of Flower Mound*, 179 F.3d 377, 383 (5th Cir. 1999). *LeClerc* may be overruled only by this court sitting en banc or by the Supreme Court. Almost as surprising as Van Staden's request, however, is the Board's argument that the denial of certiorari in *LeClerc* is "[p]erhaps the best evidence in support of the proposition that the Supreme Court has in fact *not* held that *all* classifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny." The Board is incorrect: "[D]enial of certiorari by the United States Supreme Court carries no implication concerning the merits of the case." *Sunbeam Corp. v. Masters of Miami, Inc.*, 225 F.2d 191, 196 (5th Cir. 1955) (citation omitted).

[4] We have explained the immigrant/nonimmigrant distinction as follows:

The Immigration and Nationality Act distinguishes between immigrant and nonimmigrant aliens, negatively defining an immigrant alien as "every alien except an alien who is within one of the following classes of nonimmigrant aliens." 8 U.S.C. § 1101(a)(15) . . . . An alien falling into one of fifteen exclusionary categories is a nonimmigrant alien, a class generally delimited by a lack of intention to abandon his foreign country residence and entry into the United States for specific and temporary purposes.

*LeClerc*, 419 F.3d at 410 n.2. As shown below, the Supreme Court has used the terms "resident alien," "permanent resident alien," and "immigrant" almost interchangeably. We employ "permanent resident alien" except where quotations use a different term.

No. 10-30882

that "the Supreme Court has reviewed with strict scrutiny only state laws affecting permanent resident aliens." *Id.* At no point has the Supreme Court ever "applied strict scrutiny review to a state law affecting any other alienage classifications, *e.g.*, illegal aliens, the children of illegal aliens, or nonimmigrant aliens. In such cases, the Court has either foregone Equal Protection analysis . . . or has applied a modified rational basis review." *Id.* at 416 (citations omitted).

The Supreme Court's reasons for the distinction help illuminate the case at hand. According to the *LeClerc* majority,

> The Court has uniformly focused on two conditions particular to resident alien status in justifying strict scrutiny review of state laws affecting resident aliens: (1) the inability of resident aliens to exert political power in their own interest given their status as virtual citizens; and (2) the similarity of resident aliens and citizens.

*Id.* at 417. The first condition applies because permanent resident aliens are "a prime example of a 'discrete and insular' minority for . . . whom [] heightened judicial solicitude is appropriate." *Graham v. Richardson*, 403 U.S. 365, 372 (1971) (citing *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152-53 n.4 (1938)). "Characterizing resident aliens as a *Carolene Products* minority reconciles the breadth of rights and responsibilities they enjoy with their lack of political capacity." *LeClerc*, 419 F.3d at 417.

The "breadth of rights and responsibilities" satisfies the second condition, the similarity of permanent resident aliens to citizens. In *LeClerc* we read Supreme Court precedent as recognizing that permanent resident aliens "are similarly situated to citizens in their economic, social, and civic (as opposed to political) conditions . . . . Like citizens, resident aliens may not be deported, are entitled to reside permanently in the United States, may serve, voluntarily or by conscription, in the military, are entitled to state aid benefits, and pay taxes on the same bases as citizens." *Id.* at 418 (citation and footnotes omitted).

Nonimmigrant aliens satisfy neither of the conditions triggering strict

4

scrutiny. They differ from permanent resident aliens in that their lack of political capacity "is tied to their temporary connection to this country. Moreover, the numerous variations among nonimmigrant aliens' admission status make it inaccurate to describe them as a class that is 'discrete' or 'insular.'" *Id.* at 417 (footnote omitted). Nor are nonimmigrants "virtual citizens": "They are admitted, remain, and must depart at the discretion of the Attorney General . . . . [N]onimmigrant aliens may not serve in the U.S. military, are subject to strict employment restrictions, incur differential tax treatment, and may be denied federal welfare benefits." *Id.* at 419.

*LeClerc* draws a clean line between permanent resident aliens and nonimmigrant aliens. Applicants for lawful permanent residence ("LPR applicants") like Van Staden fall into the latter category, even if close to the former. "[T]he submission of an application does not connote that the alien's immigration status has changed, as the very real possibility exists that [USCIS] will deny the alien's application altogether." *United States v. Lucio*, 428 F.3d 519, 525 (5th Cir. 2005).

The LPR application is designed to help discern whether an applicant is fit for the "virtual citizenship" entailed by permanent resident alien status. Sample subjects asked about indicate how USCIS investigates whether an LPR applicant is objectively likely to contribute to the common good as a "virtual citizen":

- Associational membership, including military service;
- Criminal history;
- Prior immigration history;
- Use of public assistance programs;
- Support for persons or organizations involved in "sabotage, kidnapping, political assassination, hijacking, or any other form of terrorist activity";
- Intent to commit espionage, overthrow the government by force, or violate

No. 10-30882

export controls;

- Affiliation with the Communist Party or other totalitarian parties, including any history of having assisted Nazi Germany and its allies with any persecution;

- Draft-dodging;

- Intent to practice polygamy; and

- Participation in torture, genocide, homicide, sexual assault, religious persecution, or arms trafficking.

U.S. CITIZENSHIP AND IMMIGRATION SERVICES, FORM I-485, APPLICATION TO REGISTER PERMANENT RESIDENCE OR ADJUST STATUS 3-5 (2011). Even when verified by USCIS investigation, the LPR application cannot identify which applicants would be model "virtual citizens." But it does identify the most readily discernable reasons why an applicant would not be fit for the "breadth of rights and responsibilities" possessed by permanent resident aliens. Determining an applicant's fitness for permanent resident alien status takes time, but until that status is granted, an applicant cannot claim its benefits.[5]

As the law of this circuit, *LeClerc* has interpreted the Supreme Court's alienage jurisprudence to mean that the Equal Protection Clause generally treats only permanent resident aliens as a suspect class.[6] An LPR applicant is not a permanent resident alien and is thus not a member of that suspect class. Therefore, occupational licensing regimes such as section 37:970(2), open to citi-

---

[5] Even if USCIS has completed its vetting, applicants may not claim permanent resident alien status until a visa number becomes available. Per its broad power to regulate immigration, Congress is entitled to set quotas that "limit the number of aliens who can be admitted to the United States for permanent residence." *Elkins v. Moreno*, 435 U.S. 647, 664 (1978).

[6] "Nonimmigrant aliens may, of course, qualify for anti-discrimination protection based on race, sex, national origin and religious adherence, just as they may otherwise enjoy the benefits of American law." *LeClerc*, 419 F.3d at 417.

No. 10-30882

zens and permanent resident aliens but not LPR applicants or other aliens, are not subject to strict scrutiny under the Equal Protection Clause.[7]

## B.

Because, under Fifth Circuit precedent, LPR applicants are not in a suspect or quasi-suspect class, state laws that treat them unfavorably compared to citizens and permanent resident aliens need only pass rational basis review.[8] "Under traditional rational basis analysis, a state law classification that neither burdens a fundamental right nor targets a suspect class will be upheld so long as it bears a rational relation to some legitimate end." *LeClerc*, 419 F.3d at 421 (citation, emphasis, and internal quotation marks omitted). "The key principle is the deference to legislative policy decisions embodied in courts' reluctance to judge the wisdom, fairness, logic or desirability of those choices." *Id.*

Viewed through this deferential lens, section 37:970(2) rests on the same rational basis as the bar rule upheld in *LeClerc*, both bearing "a rational rela-

---

[7] Van Staden does not argue on appeal that nonimmigrants are a quasi-suspect class or that state laws affecting them are subject to intermediate scrutiny. *LeClerc* gave this issue brief attention when it held that *United States v. Virginia*, 518 U.S. 515 (1996), "furnishes no authority for the application of intermediate Equal Protection analysis to alienage classifications." *LeClerc*, 419 F.3d at 420 (citing *Virginia*, 518 U.S. at 532-33). *LeClerc*'s cursory treatment of intermediate scrutiny is not strictly necessary to resolve this case, however, because Van Staden's failure to raise the issue on appeal constitutes waiver of that argument. *United States v. Thibodeaux*, 211 F.3d 910, 912 (5th Cir. 2000); *Yohey v. Collins*, 985 F.2d 222, 224-25 (5th Cir. 1993).

[8] The Supreme Court has applied "heightened" rational basis review in one relevant case, *Plyler v. Doe*, 457 U.S. 202 (1982). *LeClerc*'s interpretation of *Plyler*, however, bars this court from applying heightened rational basis review here. The *Plyler* Court found "the children of illegal aliens, having no culpability for or control over their condition, are worthy of 'special judicial solicitude' in the form of heightened rational basis review." *LeClerc*, 419 F.3d at 420 (citing *Plyler*, 457 U.S. at 223). Moreover, the children in *Plyler* were facing the "debilitating" hurdle of "denial of primary and secondary education." *Id.* In *LeClerc*, this court found "[n]othing in *Plyler* compel[ling] the determination that nonimmigrant alien law students and temporary workers are similarly situated to the children of illegal aliens, and, thus, entitled to similar heightened rational basis review." *Id.* at 421. Van Staden has made no attempt to justify heightened rational basis review here.

No. 10-30882

tionship to legitimate state interests—Louisiana's substantial interest in regulating the practice of those it admits to its" professions. *Id.* Specifically, the Board's "ability to monitor, regulate, and, when necessary, discipline and sanction [LPN's] requires that it be able to locate [LPN's] under its jurisdiction. The State's determination that the easily terminable status of nonimmigrant aliens would impair these interests and their enforcement capacity is not irrational." *Id.* In other words, the law seeks to protect Louisiana residents from LPN's who may have previously left the jurisdiction to avoid the Board's disciplinary controls on the profession.

Van Staden argues that section 37:970(2) is irrationally underinclusive because it does not protect the state interest in quality care from citizen and permanent resident alien LPN's who leave the jurisdiction. But the Board is more likely able to take disciplinary measures against citizens and permanent resident aliens who move to another state or country, either by interstate agreements or by Louisiana courts' exercising jurisdiction over the departed, based on their prior in-state domicile. With nonimmigrants, however, "Louisiana courts would have questionable ability to exercise jurisdiction," because nonimmigrants "may not establish domicile in the United States and will usually have limited assets here." *Id.*

The legislature may rationally deem nonimmigrants as categorically more transient. Even if, like Van Staden, they are LPR applicants and thus signal their willingness to reside here permanently, nonimmigrants have not been vetted by USCIS in the manner outlined above. By definition, an LPR applicant is someone whom federal immigration authorities have not yet confirmed as fit for the virtual citizenship of permanent residence, given Congressional quotas; moreover, the federal government has not yet surrendered its right to deport the applicant.

Van Staden also cites the lack of any immigration requirement in section

No. 10-30882

37:920, from the licensing statute for registered nurses ("RN's"), as further evidence that section 37:970(2) is unconstitutionally irrational. We observe, however, that better disciplinary control (via tighter immigration requirements) may also constrict the supply of nurses available. The legislature could rationally conclude that ensuring a greater supply was more important than additional quality control when it comes to RN's but not LPN's.[9] The "deference to legislative policy decisions" in rational-basis review prevents us from second-guessing the legislative judgment made in applying differing immigration requirements.[10]

AFFIRMED.

---

[9] Indeed, Van Staden's counsel conceded the existence of this tradeoff at oral argument before the district court. *See* R. 1055 ("If you're a registered nurse you don't have to be a citizen or even a permanent resident and that's because the hospitals wanted people from the Philippines and all other places, there was a shortage of registered nurses.").

[10] The same deference prevents this court from declaring section 37:970(2) irrational on the ground that neighboring Texas and Mississippi do not require LPN's to be citizens or permanent resident aliens. The Louisiana legislature may rationally make a different judgment from that of its sister states.